THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. PEDRO DEFILLÓ, Defendant and Appellant.

No. 8400.   Argued February 20, 1941.—Decided April 17, 1941.

*A. Lastra Chárriez, A. D. Marchand Paz* and *Carlos Santana Becerra,* for appellant. *George A. Malcom, Attorney General,* and *R. A. Gómez, Prosecuting Attorney,* for The People, appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

The district attorney, on January 5, 1937, filed an information against Pedro Defilló, charging him with the crime of murder in the first degree, committed three days before in Mayagüez when he attacked Francisco Roméu with a revolver, with malice aforethought and with the deliberate intention of depriving him of his life, firing three shots at him and inflicting on him several wounds as the result of which he died almost instantly.

On January 26, 1937, the defendant was arraigned and served with copy of the information. He was granted ten days to interview his attorneys and answer the information, which he did on February 4, with the assistance of counsel, pleading not guilty and requesting trial by jury.

On January 17, 1938, defendant requested a change of venue to another district. The People, through the district attorney, opposed the petition. A hearing was held at which evidence was offered and the court finally denied the petition.

On June 23, 1938, the defendant requested the judge to disqualify himself and to remove the case to another district, and on the following day he filed another motion alleging that the appointment of Judge Arjona to preside the court during the term in which the case had been set for trial, was null and void, and he should abstain from presiding over the hearing of the case. The district attorney again opposed the petition and the court denied both motions and proceeded to hold the trial, which began on June 29, 1938, and was finished on the 30th of the same month without the jury being able to reach a verdict.

On January 16, 1939, the case was again called for trial, and the jury was dismissed on the 19th because it had not reached an agreement.

Six months later, on June 29, 1939, the case was called for trial for the third time. After the trial had been held, the jury, on the 30th of June, found the defendant guilty of voluntary manslaughter. A motion for a new trial was filed on July 10 but the court denied it and sentenced the defendant to five years in the penitentiary.

The present appeal was then taken and the appellant's brief was at last filed on January 22, 1941. The hearing of the appeal was held on the 20th of February last.

Three errors are assigned. The court is charged with having committed the first two while giving its instructions to the jury, and the third when it rendered judgment.

It is convenient that we analyze the evidence, in order that we may be able to better decide the assignments of error.

Eight witnesses testified for the prosecution. The first, Dr. Nelson Perea, testified that Mr. Roméu, Deputy Marshal of the District Court, was taken to his clinic at about 8:20 of the night of January 22, 1937, with three bullet wounds and in a moribund state. When he arrived there, he was wearing a belt with an empty revolver holster. He was placed on the operation table and he was given some injections. He died shortly thereafter. That about twenty-five minutes later, Judge Moscoso arrived and ordered that an autopsy be performed, which the witness did. The deceased had three wounds.

The district attorney took off his shirt and the witness pointed out on his body the places where the wounds had been inflicted, as follows: The first, in the posterior axillary region. This is the axilla or armpit and the wound was located between the sixth and seventh ribs, at the edge of the shoulder blade. It only showed an orifice of entrance. The wound went downwards and forward, toward the right side of the body. It perforated the lung and the diaphragm, it reached the descending colon and perforated it too, likewise

perforating the mesentery, a blood vessel which supplies the intestines. The wound was necessarily mortal.

The other two wounds were light muscular ones and did not perforate any blood vessels. They had powder marks— in other words, powder was encrusted in the tissue and burns surrounded it. The orifices of entrance were in the shoulder-blade—omoplate—in the back, "as much in the shoulder-blade region as in the back," and the exit of the bullet was located in the front third of the arm. Its trajectory was "from the rear towards. the front."

The cause of the death was an abdominal hemorrhage and another hemorrhage in the left lung. Roméu was a man about five feet, ten inches tall, and rather corpulent.

Aníbal San Antonio, when called to the witness stand, testified that he was in Mayagüez, in the "Wonder Bar", with his friends from the office of the Federal Paymaster, Otis Ramírez and Adán Raldiris. There he met the defendant. The saloon consists of a large room situated in the interior, towards the back, and a small room which connects with the Yagüez Theater. The bar is located in the front part. The witness was in the large room with his friends and from there he could see the small room, on the lower level. He talked about politics and the Liberal Party with Defilló.

Roméu was in the small room, situated on the lower level, and when he heard us talking about politics, he said that the liberals had to throw all of us out, that the PRRA belonged to them and that he was going to accuse us because we were talking about politics. Nobody answered. Defendant got up. All of us immediately also got up. The defendant was down to where Roméu was. I left. I went to González Marín's recital and while I was in the theater, beside Chief of Police Vega, three shots were heard. He does not know from where they came. He did not return to the saloon.

When cross examined, he answered that he got up and left because Roméu was a man who was always armed, and he feared that there might be a fight. Furthermore, he heard Roméu talk and his attitude was not peaceful, since a man who is insulting cannot be peaceful. His voice was provocative, and his words bellicose, "words that would make anyone disappear from the place."

Otis Ramírez went with his friends on the night of the happenings to the Wonder Bar, sitting down in the room on the upper level. There he met the defendant, who took a drink with them. They talked about politics and Roméu said "that he was going to report us because we were federal employees and we were talking about politics and then Defilló got up and I immediately left." Defilló went down to the room below.

Celso Guzmán was on the night of the happenings in the saloon and saw the defendant taking a few drinks at the bar with some friends. Then they came into the larger room, sat down, ordered a bottle of rum and talked about politics. Roméu was drinking in the room on the lower level, first with Pepito Romaguera and then alone, and he said, addressing the group: "Stop talking about politics because you are employees of the PRRA and I am going to report you and see that you are dismissed." The members of the group "left . . . . in a hurry." The defendant "went towards Pachín Roméu" and in "a calm attitude" said something to Roméu that the witness could not hear. The latter then answered: "I have not spoken to you" and "then he took off his coat and he was carrying a revolver and as he was rather violent, I said to him: 'Pachín, be calm, you are too excited, shut up, have respect for other men', and he said: 'What I want is to see all of you leave here, I want to drink alone, get out of here,' and I told him: 'I am leaving', and then I said to Defilló: 'Look here, please come up too'; and he acceded to my plea and then I put my arm on his shoulder

and as we were leaving thus, Defilló suddenly stopped. Pachín, by this time had taken off his coat and sat down on his chair and Defilló said to him: 'Look here, sir, you won but you are not right.' . . . And then an employee of Tuto came to tell Defilló that he had to move his car from the place where it was parked in front of the fire station, as the fire engines were going to come out, and then Defilló left, leaving his hat behind.''

The defendant returned in about twelve or fifteen minutes. He came in by the door which leads to the Yagüez Theater. I went after him and said: "Look here Mister, the bottle of rum which you ordered is still here." He requested that they bring it to him, sat down and asked me: "Old man, would you like a drink?", and I replied: "No, sir, thank you,'' and he got up and when he got up Roméu said to him: "Would you like a drink, friend?", and Defilló answered that as he had just received an insult from him he could not accept his invitation. Then Pachín (Roméu) said: "Those who are near, watch out." And at the same time he put his hand on his hips and when he said "Watch out", the first shot was fired and then two more. The first shot came out of the defendant's side, but the witness cannot say whether the defendant was the one who fired it. He was looking at Pachín who did not have a revolver in his hand but instead removed his hand from the holster, turned and fell. Meanwhile, two more shots were heard and he noticed the defendant who had a revolver in his hands but threw it into an adjacent courtyard and when the police came gave himself up.

Baudilio Vega, District Chief of the Insular Police, was in the Yagüez Theater and heard three shots and immediately went toward the bar and when he got there, Defilló was leaving. Celso Guzmán pointed him out as the person who had fired the shots and then Defilló told him that he had been the one. He inquired about the weapon and Defilló showed

him the place where he had thrown it. The Policeman Raya found a Colt revolver, caliber 38, which had three empty shells and two cartridges. The witness recognizes it from two which are shown to him.

Referring to Roméu, Vega said that he was lying down, the upper part of his back resting on one of the steps of the stairs which lead to the toilet. He stated that he had been wounded in the back but he did not blame anyone. He seized another Colt revolver at Roméu's right, which was resting upon the upper part of his right arm. The revolver had six shells which had not been fired. None of them was fired. The holster had no cover and the revolver could have fallen from it.

Ernesto Irizarry, Insular Policeman, was in the theater, he heard three shots, ran toward the saloon and arrested the defendant, who said: "If I fired at him it was because he provoked me; I was insulted." He saw Roméu on the floor. Reyes was trying to lift him. Chief Vega ordered that he be lifted from the floor. He had several blood stains in the back and they took him to the clinic. The revolver was lying on the floor when Chief Vega picked it up.

The last two witnesses for The People were Angel Ríos and Víctor Barrios. The first left the bar before the shots were fired and the second, who should have seen everything, did not testify anything of importance. After a series of questions, cross questions, objections and interruptions, he ended up saying that he did not know who had fired the shots.

The defense called to the witness stand Celso Guzmán, Celestino Nieves, Félix Dicks and Nicolás Soto Ramos.

Guzmán stated that the defendant talked only with Chief Vega when he left the bar after the event. The district attorney asked him if he had testified on a previous occasion that the defendant had spoken to one of the policemen. The witness replied that the truth was what he was now testify-

ing, and when the district attorney asked him if he had at any time testified before him that the defendant had said to Chief Vega: "I killed him because he was going to kill me", he answered that he had not testified this because he had not been questioned concerning this incident.

Celestino Nieves was at the Wonder Bar. He saw Roméu enter. He sat drinking in the terrace downstairs. Romaguera wanted to take him away but he refused. Then Defilló entered and sat down with some friends from the PRRA, Roméu getting up to provoke Defilló. Guzmán intervened and as someone told Defilló that his car was parked in an inconvenient place, he went out, returning in about ten or twelve minutes. Then Roméu invited him to have a drink with him and Defilló refused, Roméu then saying: " 'All right, if you don't wish to have a drink with me you can go to hell' and then he got up and began to insult him and when Roméu began to make use of his revolver, Defilló drew out a revolver and quickly fired three shots at Roméu."

Félix Dicks was in the Yagüez Theater when he heard three shots and looked in through a window, seeing Chief Vega "who picked a revolver up from the floor with a handkerchief near Pachín Roméu's hand then smelled it."

Nicolás Soto, a journalist, entered the bar and saw and heard Roméu insulting Defilló and his friends as follows: "He was telling them that they should stop talking about politics; that they were employees from the PRRA, that they were all scoundrels; that he was a public officer and would not permit anybody to talk about politics; that he was a member of the Union Republican Party and was in power. Then Defilló got up from the table and asked Roméu why he expressed himself in that manner since they were all honorable persons. Then Roméu, in a violent manner, told him that he could go to hell and that he should leave immediately . . . Defilló then said to Roméu: 'You win, although you are not right.' Something like that. Then the owner of the

Wonder Bar came up and told Defilló that he should remove his car from the place where it had been parked. Then Defilló went out and returned in about ten or twelve minutes. Guzmán told him that he had a bottle of rum which was still there. Defilló took the bottle and offered Guzmán a drink. Guzmán told him that he did not drink. Defilló took a drink from the bottle. He went toward the hat rack to take his hat; then Pachín Roméu said to him from downstairs; 'Come on and have a drink with me.' Defilló answered: 'How are we going to have a. drink' if he, Roméu, had been insulting him a short while before. Then Pachín Roméu got up and took out his revolver saying: 'Everybody be quiet, I am going to finish this right now.' Defilló then rapidly fired three shots at Roméu."

Such is the evidence which we have summarized, attempting to repeat as far as possible the very words of the witnesses.

■ The first assignment of error reads thus:

"The lower court committed error in its instructions to the jury when it summarized incorrectly certain evidence offered against the defendant appellant, as follows:

" 'One of the witnesses in this case testified—I think it was. witness Vega—that at the moment when he arrived, a few seconds after the shots, at the place of the happenings, the wounded man, who was lying on the floor in the manner in which he found him, told him: "They have wounded me *from the* back" (Italics supplied). Another of the witnesses also testified concerning certain words of the defendant.' (Pages 9 and 10 of the Instructions.)

"The truth being that what the witness Vega testified concerning the statements made by the wounded party was:

" 'He stated that he had been wounded *in* the back' (lines 8 and 9, page 51, Transcript of the Evidence.) (Italics supplied.)

"The court continued its incorrect summary of the testimony of the above mentioned Vega giving undue emphasis to this summary, when it said: . . . . .

" 'The statements made by a person moments after he has been the object of any illegal attack and as soon as he can talk consciously, either voluntarily or in answer to questions made to him before be·

was sufficiently conscious to answer them, are part of the *"res gestae"*. . . .' "

There is no doubt that according to the stenographic record, the witness said "in the back". Neither is there any doubt concerning the fact that if emphasis is given to the difference between the two expressions, such a difference exists and may cause the commission of a serious error.

It can be seen, however, from the action of the jury that if it noticed the difference, it did not take it into consideration, since the verdict which it rendered was one of manslaughter and not of murder.

Furthermore, the defendant did not inform the court in any manner of its error nor did he note an exception to the instruction. There was no prejudice. There is no ground for a reversal. See 14 R.C.L. 780, and the citation from the same work which we shall copy when considering the second assignment of error which also concerns the instructions.

The second assignment is as follows:

"The lower court committed error in its instructions to the jury when it gave instructions concerning self defense based on a real danger and did not give any concerning self defense based on an apparent danger, which was the theory of the defendant appellant, except the following ambiguous and misleading instruction:

" ' . . . . But if the danger is not real, but is apparent, it is enough that the circumstances be of such a nature that although there be an apparent danger, that is, that the danger be real and that the defendant cannot avoid it without killing his enemy.' "

The instruction is confusing, but it exists, and the confusion perhaps is the fault of the stenographer rather than that of the judge, since if we follow the logical trend of the judge's reasoning, we can see clearly that what he probably said was:

"But if the danger is not real, but instead apparent, it is enough that the circumstances be of such a nature that although there be *only* an apparent danger, *the defendant believes it* to be a real danger and that he cannot avoid it without killing his enemy."

Furthermore, what was copied in the assignment of error is only one paragraph of the instruction concerning the matter, which is ample and sets forth the law in its entirety, and defendant did not request the court to clarify it nor did he take exception to it, all of these being necessary to invoke the error successfully in the appellate court.

Ruling Case Law, summarizing the run of decisions upon the matter, says:

"It is hardly possible for any court to charge in such language as to comprehend every possible point of view in which the case might be put or to notice every exception to the general rules of law. Therefore it is generally considered to be the duty of counsel to aid the court in the function of instructing the jury. And the very purpose of permitting requests to charge is that the jury may be fully informed as to all the law governing the case, and the trial court enabled to correct at once any mistakes that may have been made in instructing them. The rule is therefore firmly established that where the charge of the court does not cover all phases of the case, counsel is bound to call its attention to the omission by an appropriate request or be precluded from making such failure available as reversible error. The rule is also well settled that a party must, if he desires them, request the court to give more definite, or more specific, or fuller instructions. Likewise, where the court has stated a general rule of law correctly, if a party desires the jury to be informed respecting the limitations thereon he should request the court so to charge. And in applying the rule that mere omissions are not fatal in the absence of a request to supply them, it has been held that the failure of the court to explain the meaning of a word or phrase in an instruction is not reversible error, in the absence of a request to define the word; that a judgment in a criminal case will not be reversed for the mere failure of the court to charge on the subject of alibi, unless a special charge submitting that issue is requested or an exception reserved at the time; that where a judge, in reviewing the evidence, omits or insufficiently refers to portions that counsel believes material, it is his duty to call the judge's attention to such evidence before the case goes to the jury, and that where evidence is admissible for a certain purpose only, it is not error for the court to fail to limit the use of such

testimony in the absence of a request for a charge to that effect. Also the omission from a charge to a jury in an action for negligence of an instruction expressly stating that the defendant's negligence must have been the proximate cause of the plaintiff's injury, in order to render the defendant liable, is not, in the absence of a specific request for such instruction, reversible error. But if properly requested to charge that the defendant's negligence must have been the proximate cause of the injury complained of, it is error for the court to refuse to give the instruction."

"A party should request the court to give an explanatory charge where he perceives that there is doubt whether the jury will properly understand the charge given by the court, or where an instruction which is in general terms accurate, lacks an explanation fitted to the facts of the case to make it entirely accurate, or where it may be taken in a broader sense than is consistent with the law, or has a tendency to mislead the jury." 14 R.C.L. 795.

A similar series of cases decided by this Court applies the same doctrine summarized in the above citation, as follows: *People* v. *Mediavilla*, 54 P.R.R. 538, 554; *People* v. *Martínez*, 50 P.R.R. 744, 746; *People* v. *Hernández*, 49 P.R. R. 406, 409; *People* v. *Vázquez*, 48 P.R.R. 413, 417; *People* v. *Nieves*, 48 P.R.R. 149, 152; *People* v. *Benítez*, 47 P.R.R. 74, 80; *People* v. *Mercado*, 46 P.R.R. 147; *People* v. *Estrella*, 45 P.R.R. 448; *People* v. *Maldonado*, 45 P.R.R. 405, 407; *People* v. *Macaya*, 43 P.R.R. 595; *People* v. *Varela*, 42 P.R.R. 792; *People* v. *Peña*, 39 P.R.R. 844, 845; *People* v. *Valentín*, 36 P.R.R. 386; *People* v. *Serrano*, 35 P.R.R. 309; *People* v. *Concepción*, 30 P.R.R. 443; *People* v. *Matos*, 26 P.R.R. 520; *People* v. *Ramírez de Arellano*, 25 P.R.R. 243; *People* v. *Boria*, 12 P.R.R. 166.

The third and last of the assignments of error involves the apraisal of the evidence.

The summary which we have made of it speaks for itself. Roméu acted without authority, incorrectly, when he interfered with the group in which the defendant was, but the latter killed him without justification. Those to whom Roméu

referred directly did nothing. If the defendant had assumed a similar attitude, the crime would not have been committed.

Roméu was intoxicated. Armed as he was, he could have been considered a dangerous character, but the danger could have been avoided easily. The defendant, after seeing him the first time, had the opportunity of becoming aware of the situation and in spite of that he returned to the saloon. Roméu did not insist in his insults. On the contrary, he invited the defendant to have a drink with him. The defendant refused and Roméu got up from his seat.

The evidence for The People and for the defendant differs with respect to what Roméu said and did. The evidence for the defendant was not believed by the jury. The evidence for The People, consisting mainly of the testimony of Celso Guzmán, does not uphold the theory of the apparent danger. Hardly had Roméu stood up and uttered his threat, when he was mortally wounded by the bullet which the defendant accurately fired at him and later by two other bullets, and it is clear that he did not have time to draw his weapon if that was his intention. The defendant was not moved by fear— real or apparent—of losing his life or receiving serious personal injury. All the facts show that he was prepared for any emergency and that he fired before Roméu had the opportunity of attacking him, if that was, we repeat, his intention.

The defendant cannot complain in truth of the verdict of the jury or of the sentence which the court imposed upon him. The verdict was the most lenient that could have been brought under the circumstances and the sentence which could have reached ten years in the penitentiary was only set at five.

There is no reason for the reversal which appellant requests. The judgment must be affirmed.

Mr. Justice Todd, Jr., took no part in the decision of this case.

'ON REHEARING

May 21, 1941

Appellant has filed in this case a motion for reconsideration in which he again lays emphasis on the instructions given by the court to the jury, which according to him are erroneous.

When we studied and decided the errors assigned to this effect in our opinion of April 17, we copied the assignments together with the part of the instructions under attack, copying later from appellant's own brief. After studying carefully the record of the appeal we find that the instructions in their entirety, as they were certified by the trial judge, do not appear in the same, so that appellant did not even place this Court in a position to decide the questions which were raised, and our study of the appeal went beyond what the condition of the record justified.

The motion of reconsideration is denied.